* * * * * * * * * * *
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Donovan and the briefs and arguments of the parties. The appealing party has shown good ground to reconsider the evidence. Accordingly, the Full Commission reverses the Opinion and Award of the Deputy Commissioner and enters the following Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in their Pre-Trial Agreement and at the hearing as:
 STIPULATIONS
1. The Industrial Commission has jurisdiction over the subject matter of this case, the parties are properly before the Commission, and the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act at all relevant times.
2. On 8 September 2003, plaintiff slipped and fell on a ladder at work and injured her right wrist and may have sustained other injuries. This accident arose out of and in the course of plaintiff's employment with defendant-employer.
3. On 8 September 2003, the employee-employer relationship existed between plaintiff and defendant-employer.
4. On 8 September 2003, St. Paul Fire Marine Insurance Company was on the risk for defendant-employer.
5. Plaintiff was given work restrictions by Dr. Mark Zeringue on 10 September 2003.
6. Plaintiff was terminated from employment on or about 12 November 2003.
7. The issues for determination are:
 a. Whether plaintiff's carpal tunnel syndrome is causally related to her compensable injury by accident of 8 September 2003?
 b. Whether plaintiff sought treatment with unauthorized physicians after 1 October 2003?
c. What is plaintiff's average weekly wage?
d. To what benefits, if any, is plaintiff entitled?
8. The parties stipulated the following documentary evidence:
 a. Stipulated Exhibit #1: Medical records, I.C. Forms, personnel records, job description and discovery responses
9. In addition to Stipulated Exhibit(s), the following Exhibits were admitted into evidence:
 a. Defendants' Exhibit #1: Job requirements for the Quality Control — Inspector position
10. Following the hearing before the deputy commissioner, the depositions of Drs. Mark J. Zeringue, William J. Mallon, Martha Miles, L. Dee Austin-Cox and George S. Edwards were submitted and received into evidence.
 * * * * * * * * * * *
Based upon all of the competent evidence adduced from the record and the reasonable inferences therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was 50 years old. She completed the 12th grade and attended vocational school where she received a certificate in medical billing. Prior to her employment with defendant-employer, plaintiff worked 3½ years for Redman Homes as an inspector of manufactured housing, in quality control for Static Control, a manufacturer of computer controls, and in customer service with K-Mart.
2. On 9 January 2002 plaintiff sought treatment from Dee Austin Cox, D.C. for injuries sustained in a motor vehicle accident. Plaintiff presented with complaints of neck, left shoulder, right shoulder, low back and right leg pain, which were the same complaints she claimed she experienced 3 months after her incident at work. Plaintiff indicated she had experienced neck and back pain within the past 6 months. X-Rays performed on 9 January 2002 confirmed degenerative changes of plaintiff's cervical spine. Dr. Cox continued treating plaintiff for neck, shoulder and low back symptoms for a total of 29 visits until May 16, 2002 when plaintiff discontinued treatment, however the treatment from the chiropractor's perspective had not ended and plaintiff was not released.
3. Plaintiff first sought treatment with Dr. Martha Miles, a neurologist on 28 March 2002, upon referral by Dr. Cox, after her motor vehicle accident in January 2002. At the first visit on 28 March 2002 plaintiff reported complaints of right upper extremity and right lower extremity, numbness and weakness as well as sharp, shooting pains in her right leg and low back, resulting from the automobile accident. Plaintiff also complained of soreness around her right elbow, an identical complaint she had after 8 September 2003. Dr. Miles diagnosed plaintiff with possible right L5-S1 radiculopathy and recommended a lumbosacral MRI and EMG nerve conduction studies of the right lower extremity. The tests were performed and returned negative results, indicating a lack of radiculopathy. Dr. Miles continued to treat plaintiff for low back pain and right lower extremity pain through 7 May 2002. At that time, Dr. Miles provided plaintiff with medication and recommended an additional lumbosacral MRI for further evaluation of the low back pain and right leg pain.
4. Plaintiff began her employment with defendant-employer through a temporary agency on 25 February 2003. Plaintiff was required to undergo a "pre-placement" medical examination and complete a health questionnaire. Plaintiff denied that she had ever experienced pain in her arms. She denied she had ever had a back problem that was treated by a physician or a chiropractor. On 14 July 2003, plaintiff was hired full-time by defendant-employer, a manufacturer of modular housing. Plaintiff's position on 14 July 2003 was to work in the function-testing department, testing various systems within modular homes, including plumbing and electrical systems. This position required plaintiff to occasionally lift 10-50 pounds, reach, twist, crawl, push pull and use a staple gun. Plaintiff was also required to crawl underneath homes and use aluminum ladders.
5. On 19 August 2003, plaintiff was moved to the Quality Control/Service Department. Her duties required plaintiff to check work orders, perform visual inspections of homes near completion, mark cosmetic defects with red tape to be fixed by other workers and complete a data plate for each home she inspected. Plaintiff also performed data entry, filed and answered the telephone and mail. While plaintiff was working as a quality control inspector, she still performed some of the tasks of the function-testing department as needed by defendant-employer. The employer utilized a team concept, which allowed any employee, injured or not, to receive assistance as needed. According to plaintiff, she only performed activities she was capable of performing following her injury.
6. On 8 September 2003, plaintiff fell while climbing a wet ladder to gain entry into a manufactured home. Plaintiff was standing on the first rung of the ladder when she slipped and fell into the house, hitting her right elbow and wrist on the floor and hitting her right shoulder on the wall of the home. Plaintiff reported the accident to her co-workers and to her team leader and supervisor.
7. Plaintiff did not request to see a doctor after the accident on 8 September 2003; however, the night of the accident she experienced swelling in her right wrist and elbow. On 9 September 2003, plaintiff reported to Oscar Baca in the safety section that she was having trouble with her right arm. Plaintiff was referred to Dr. Mark Zeringue, an internal medicine doctor at Chatham Medical Specialists.
8. Plaintiff presented to Dr. Zeringue on 10 September 2003. Plaintiff reported that she slipped off the first rung of a ladder, reached out to catch herself with her right hand and fell, resulting in injury to her right shoulder, right elbow, right wrist and right hand. Upon examining plaintiff, Dr. Zeringue noted that plaintiff had a spasm of the supraspinous muscles in the right shoulder, some limitation of neck movement, a slight limitation of flexion in the elbow, swelling of the right forearm and limitation of movement of the right wrist. Dr. Zeringue reviewed x-rays of plaintiff's right elbow, wrist and hand, which showed no fractures or dislocations.
9. Dr. Zeringue diagnosed plaintiff with a sprain of her right wrist and extensive bruising of the forearm and hand. He provided plaintiff with pain medication, advised plaintiff to rest the right extremity and assigned a work restriction of no lifting greater than ten pounds with her right arm. Dr. Zeringue permitted plaintiff to continue working because she "described her job as quality assurance, which she said did not require much use of her right arm."
10. Plaintiff returned to Dr. Zeringue on 1 October 2003, with complaints of continuing pain primarily in the right wrist and elbow. Dr. Zeringue's examination showed that plaintiff still had some limitation of neck motion, right shoulder motion had improved, elbow motion was back to normal, and plaintiff still had significant limitation of motion of the right wrist. Dr. Zeringue opined that plaintiff still suffered from a right wrist sprain and was probably developing some tendonitis involving the right elbow. He provided plaintiff with a steroid pack to treat the tendonitis, planned physical therapy treatment and continued plaintiff's lifting restrictions.
11. Seven days later and without defendants knowledge, plaintiff presented on 8 October 2003 upon self-referral to Dr. Surinder Dhawan at Carolina Doctors Medical Care, complaining of moderate pain in her neck, right shoulder and wrist. Dr. Dhawan examined plaintiff and reviewed the x-rays taken by Dr. Zeringue. He gave plaintiff work restrictions of no lifting over five pounds, no use of the right hand, and no bending or stooping. He referred plaintiff to orthopedic specialist, Dr. Charles T. Beemer for further evaluation.
12. On 13 October 2003, plaintiff presented to Dr. Beemer with complaints of continuing pain in the wrist and arm up to the shoulder and neck, with numbness in the right fourth and fifth fingers. Plaintiff reported she had sustained an injury at work when she fell from a ladder and hurt her right shoulder, elbow and wrist. Dr. Beemer noted that plaintiff described the severity of her condition as "nuisance." A comprehensive clinical examination revealed no evidence of bruising or swelling, some tenderness and full range of motion with mild discomfort of the right arm. Plaintiff's neurological examination suggested possible carpal tunnel syndrome and cubital tunnel syndrome. Plaintiff was referred for an EMG and nerve conduction studies.
13. On 16 October 2003, plaintiff returned to Dr. Zeringue and reported that the pain in her right arm was improved. Her neck and shoulder pain had resolved. Plaintiff did not return to Dr. Zeringue after this visit. At no time during his treatment of plaintiff did Dr. Zeringue remove plaintiff from work. Plaintiff did not return to Dr. Zeringue after this visit.
14. Nerve conduction studies were performed on plaintiff by Dr. Mohan Deochand, a neurologist, on 22 October 2003. Plaintiff's electrodiagnostic studies disclosed median neuropathies of plaintiff's right and left wrists of the same severity, and right cubital tunnel syndrome.
15. Plaintiff returned to Dr. Beemer on 28 October 2003. Following his examination of plaintiff and review of the nerve conduction studies, Dr. Beemer diagnosed plaintiff with right side cubital tunnel syndrome and bilateral carpal tunnel syndrome. Surgical intervention was discussed and while plaintiff indicated that she wished to pursue that course, she did not undergo surgery at that time.
16. On 21 November 2003, plaintiff presented to Dr. George Edwards, who is board certified in hand surgery and orthopedics, upon self-referral for a second opinion regarding surgery. Plaintiff reported pain and numbness in the right upper extremity extending from the neck through the shoulder and elbow and all of the fingers of the right hand. Plaintiff specifically noted that she did not have symptoms in the left hand or upper extremity. Plaintiff indicated to Dr. Edwards that her job was not strenuous and did not require elbow flexion for prolonged periods of time.
17. Dr. Edwards examination of plaintiff's right extremity did not reveal any visible signs of injury such as swelling or bruising. Plaintiff had subjective complaints of pain throughout her arm, but demonstrated no weakness or atrophy. Edwards noted neurological abnormalities extending from the neck down to the fingers on plaintiff's right side. Plaintiff exhibited a positive Sperling Maneuver that Dr. Edwards opined could be indicative of a pinched nerve in the neck. Plaintiff also exhibited positive signs for Thoracic Outlet Syndrome and ulnar nerve distribution of the right hand. Plaintiff tested negative for carpal tunnel syndrome and Dr. Edwards opined that plaintiff had no symptoms consistent with Reflex Sympathy Dystrophy or Chronic Regional Pain Syndrome.
18. Dr. Edwards opined that plaintiff's primary problem was in her neck, with secondary compression of the ulnar nerve in the right elbow, or cubital tunnel syndrome. Dr. Edwards recommended that plaintiff wear splints as needed for her bilateral carpal tunnel symptoms and that she avoid elbow flexion for long periods of time. He believed these symptoms would resolve in time and did not recommend surgery for these conditions. He recommended that plaintiff seek further treatment of her neck symptoms before he would discuss surgical options for that condition.
19. Dr. Edwards did not believe plaintiff's condition would prevent her from performing her job duties and he did not write her out of work. He did not impose any physical restrictions on plaintiff. Dr. Edwards set up an appointment in four weeks should plaintiff's numbness continue. Plaintiff did not return to Dr. Edwards.
20. After plaintiff was terminated for excessive absenteeism plaintiff consulted Dr. Martha Miles on 23 December 2003, the neurologist who had treated her after the motor vehicle accident in January 2002, upon self-referral. Though plaintiff's complaints had steadily improved, she presented to Dr. Miles complaining worsening of right arm and wrist pain allegedly resulting from the injury by accident of 8 September 2003. Plaintiff was initially interviewed by a nurse who recorded that plaintiff "fell off a ladder at work and caught herself with her right arm." The medical records for this visit did not document plaintiff striking her right wrist or elbow; however, Dr. Miles insisted she "vividly" recalled plaintiff demonstrating how she fell and that she struck her right wrist and elbow. Dr. Miles indicated she required plaintiff to repeatedly recount the original injury on every office visit and plaintiff may have given her a visual demonstration of the injury on more than one occasion.
21. However, Dr. Miles found plaintiff's clinical examination within normal limits except for some loss of motion of the neck and subjective complaints of pain. Dr. Miles recommended a cervical MRI and EMG/nerve conduction studies of the right arm. Dr. Miles removed plaintiff completely from work pending the MRI due to the point tenderness in her neck, which Dr. Miles claimed could have been suggestive of a broken neck. Plaintiff had incorrectly reported to Dr. Miles that her job required climbing, lifting, pushing, pulling, bending and ladder climbing, which plaintiff could not perform due to her arm pain.
22. On 14 January 2004 plaintiff underwent an EMG which disclosed mild right cubital tunnel syndrome and mild bilateral carpal tunnel syndrome. The cervical MRI showed that plaintiff had multi-level degenerative disk disease in the cervical region. Dr. Miles recommended bilateral wrist splints to be worn at night for the carpal tunnel symptoms and an orthopedic evaluation to determine whether surgical intervention was necessary for the cubital tunnel syndrome. Pending the orthopedic evaluation, Dr. Miles continued plaintiff out of work.
23. Plaintiff returned to Dr. Miles on 4 February 2004 for a follow-up examination. Dr. Miles opined that plaintiff had a work-related injury to the cervical spine and the right wrist, and that the symptoms were exacerbated by activities requiring the use of the right arm. She recommended continued conservative care for the mild carpal tunnel symptoms of using splints and an elbow protector for the right elbow. While Dr. Miles continued plaintiff's out of work status, she opined that plaintiff could have performed "a very sedentary job with very flexible hours," in order to accommodate her doctor visits.
24. On 29 March 2004, plaintiff reported to Dr. Miles that she had experienced three or four episodes of "a freezing cold arm" without associated pain that lasted 30 minutes each time. Dr. Miles opined that plaintiff might be developing reflex sympathetic dystrophy (RSD). At the examination, plaintiff's symptoms had not changed significantly from those on prior visits. Dr. Miles continued the recommendation of conservative care and still recommended obtaining a second opinion regarding a surgical release of the right cubital tunnel. Again, she continued plaintiff out of work pending a decision on surgical intervention of plaintiff's cubital tunnel syndrome.
25. On 6 April 2004, plaintiff presented to Dr. William J. Mallon, a board certified orthopedic surgeon with a subspecialty in shoulder and elbow surgery, upon referral from Dr. Miles, with complaints of pain at the right elbow with radiating numbness and pain down the right forearm and into the fingers of the right hand. Dr. Mallon examined plaintiff and found a normal range of motion in plaintiff's right shoulder, that plaintiff had no areas of tenderness in her neck, and tenderness over the medial upper condyle and the ulnar nerve at the right elbow. Dr. Mallon diagnosed plaintiff with Type II Chronic Regional Pain Syndrome of the non-RSD type. Dr. Mallon explained that there are two types of complex regional pain syndrome. The first is reflex sympathetic dystrophy and the second is non-sympathetically mediated pain, which was described as chronic pain without discernable physical findings in the affected area.
26. Dr. Mallon recommended physical therapy to treat plaintiff's condition as patients with Type II CRPS should remain as active as possible. He opined that because plaintiff's pain was diffuse and not specifically related enough to the elbow, that surgery on the elbow did not have a high probability of success in relieving plaintiff's symptoms. In addition, Dr. Mallon noted that patients with Chronic Pain Syndrome or RSD often get worse after surgery as the surgery can aggravate the symptoms of the condition. Dr. Mallon further opined that plaintiff could perform the quality control inspector position.
27. On 26 May 2004 plaintiff returned to Dr. Miles, who repeated the EMG of plaintiff's right arm and noted no significant change in her condition. Despite the fact that Dr. Mallon had not diagnosed plaintiff with RSD nor had he recommended surgery, Dr. Miles still opined that plaintiff could not work at that point as she was titrating plaintiff's Neurontin, even though earlier Dr. Miles had noted on 24 February 2004 that an increase in plaintiff's Neurontin "did not help much." Dr. Miles did admit that plaintiff's failure to respond to Neurontin could indicate she was experiencing neuropathic pain.
28. As of 21 June 2004 Dr. Miles had removed plaintiff from work due to "pain from . . . reflex sympathetic dystrophy" even though Dr. Mallon had noted plaintiff did not suffer from reflex sympathetic dystrophy.
29. Following the examination by Dr. Mallon, Dr. Miles ordered additional electrodiagnostic testing. Those results were reviewed by Dr. Miles on 23 June 2004 and revealed no significant changes from the prior testing done on 14 January 2004. Dr. Miles continued her recommendation that plaintiff not return to work due to her pain and the effects of her medications.
30. Dr. Miles opined plaintiff was capable of performing the quality control inspector if the lifting requirement was no more than a few pounds and the requirement of using ladders was eliminated. Dr. Miles agreed plaintiff was capable of performing sedentary employment and that plaintiff was physically capable of undergoing a functional capacity evaluation.
31. At her deposition on 21 September 2004 Dr. Cox was asked whether plaintiff's current condition was related to the injuries from the motor vehicle accident in January 2002. First noting that her treatment of plaintiff had ended 16 May 2002, prior to the 8 September 2003 injury by accident, Dr. Cox opined that plaintiff's current wrist and elbow problems were not related to the injuries suffered in the prior automobile accident; however, she further opined that the trauma plaintiff suffered on 8 September 2003 could have caused an aggravation of the prior cervical problem. As Dr. Cox had not treated plaintiff since 16 May 2002 and had not examined plaintiff after the incident on 8 September 2003, her opinion is given little weight.
32. Plaintiff was terminated from employment with defendant-employer on 12 November 2003 as a result of amassing more than 40 points for absences. Personnel directives explain that an absence due to medical treatment related to a workplace injury would incur no points, while a sick day or other absence that is unrelated to a workplace injury would incur eight points; reduced to four points if the employee provided a doctor's note for the absence. An employee who accumulates 20 points receives an awareness warning, followed by a written warning at 24 points, a final warning at 32 points and termination at 40 points. There are only three instances in which plaintiff accumulated points (four points each time) for doctor visits which plaintiff claimed were related to her work-place injury; however, each of the three visits were to medical providers who were not authorized by defendants but chosen by plaintiff and as such were not deemed related to the workplace injury. Plaintiff received her awareness notification of 20 points on 23 October 2003. She received her written warning for 24 points on 30 October 2003 and final warning at 32 points on 10 November 2003. As of 10 November 2003 plaintiff had accumulated 47 points and was due for termination. Only 12 of the 47 points were for visits to doctors which plaintiff contends treated her for her alleged work place condition.
33. In early November 2003, plaintiff's father became ill and plaintiff left work to attend to him. Plaintiff was informed that if she provided a note from her father's physician, she would not accumulate points for these absences and would not be terminated. Plaintiff never provided the requested documentation. Accordingly, she was terminated from her employment as a result of her failure to provide the requested documentation. A non-injured worker would have been terminated in the same circumstances. Plaintiff did not offer competent evidence that any disability after 12 November 2003 was related to her compensable injury by accident of 8 September 2003. Plaintiff has not attempted to find alternate employment.
34. The Full Commission gives greater weight to the opinions of Dr. Zeringue, Dr. Beemer, Dr. Edwards and Dr. Mallon. Dr. Zeringue treated plaintiff immediately after the incident of 8 September 2003 and diagnosed a right wrist sprain. He treated plaintiff conservatively, documented consistent improvement and as of 16 October 2003 plaintiff reported her neck and right shoulder pain had resolved and her right arm pain had improved. Dr. Beemer's clinical examination was normal with the exception of tenderness on the lateral side of the right elbow and questionable sensory changes in the elbow and hand. Dr. Edwards, a hand and arm specialist, found plaintiff's clinical examination completely normal, except for a subjective complaint of diffuse pain in the right arm. Plaintiff had no evidence of weakness or atrophy or symptoms consistent with RSD. However, plaintiff presented to Dr. Miles on 23 December 2003, with a different set of complaints including stiffness in her shoulder and neck, tingling in her fingers, inability to lift her arm to do her hair and shooting pains up the arm that brought tears to plaintiff's eyes. Even Dr. Miles admitted that plaintiff's clinical examination on that day was within normal limits, except for "some" limitation of motion of the neck and a subjective complaint of pain.
35. The Full Commission gives little weight to the opinion of Dr. Miles, who acknowledged that she removed plaintiff from work solely on the basis of her subjective complaints of pain, which Dr. Miles attributed to RSD and plaintiff's representations that she was unable to perform daily chores and failed to review plaintiff's prior medical records. Further, Dr. Miles ignored the opinion of Dr. Mallon, the orthopedic surgeon to whom Dr. Miles had referred plaintiff, that plaintiff did not suffer from RSD and was capable of returning to work in the quality control inspector position.
36. Plaintiff implied in her testimony that she performed the more physically demanding function testing job throughout her employment. However, plaintiff was transferred from the Function Testing Department to the Quality Control/Service Department on 18 August 2003. Unlike the functional testing duties, which did require plaintiff crawl underneath homes and move countertops and boxes of ceramic tile, the quality control position was primarily administrative. All of the evidence confirms that plaintiff's work as a quality control inspector did not require significant exertion. Any other testimony to the contrary is not accepted as credible. Based on the inconsistencies in plaintiff's testimony, her misrepresentation of her physical condition to her doctors and to her employer, her misrepresentation of her job duties to her physicians, the Full Commission finds plaintiff's testimony not credible.
37. Defendants provided medical treatment for plaintiff through Dr. Zeringue. Plaintiff embarked on her own course of care with various physicians she chose without the permission or consent of defendants or the Industrial Commission. While plaintiff had the right to pursue treatment of the conditions for which defendants had denied liability, with physicians she chose, plaintiff still had the burden of proving the treatment she received was for conditions causally related to her injury.
38. Plaintiff was not employed full-time by defendant-employer for 52 weeks prior to her injury by accident on 8 September 2003; therefore, her average weekly wage may not be computed using that method. A fair and just method to both parties to establish plaintiff's average weekly wage would be to divide the earnings during the period of plaintiff's employment by the number of weeks and parts thereof. Accordingly, plaintiff's average weekly wage as computed by the Form 22 Wage Chart is $431.87, yielding a compensation rate of $287.93.
39. Plaintiff suffered an injury by accident arising out of and in the course of her employment with defendant-employer on 8 September 2003 but continued to work in the same employment earning the same of greater wages until 12 November 2003, when she was terminated due to absenteeism. As a result of the injury by accident, plaintiff contracted am admittedly compensable cubital tunnel syndrome of the right elbow, which has not prevented plaintiff from earning the same or greater wages in the same or any other employment and for which no doctor has removed her from work. Plaintiff failed to prove that her Type II Chronic Regional Pain Syndrome of the non-RSD type, pre-existing degenerative cervical condition and mild bi-lateral carpal tunnel syndrome are related to the work-place injury or that her injury aggravated a pre-existing cervical degenerative disc disease.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained an injury by accident arising out of and in the course of the employment on 8 September 2003 when she slipped and fell while climbing a wet ladder and injured her right neck, shoulder, elbow and wrist. Subsequently, plaintiff developed right cubital tunnel syndrome, which was causally related to the compensable 8 September 2003 work-related injury by accident. However, plaintiff failed to prove that her Type II Chronic Regional Pain Syndrome of the non-RSD type, pre-existing degenerative cervical condition and mild bi-lateral carpal tunnel syndrome were causally related to or materially aggravated by the compensable 8 September 2003 injury by accident. N.C. Gen. Stat. § 97-2(6).
2. The Court of Appeals applied a balancing test in Seagravesv. Austin Co. of Greensboro, 123 N.C. App. 228, 472 S.E.2d 397
(1996). Under the Seagraves test, to bar payment of benefits, an employer must demonstrate initially that: (1) the employee was terminated for misconduct; (2) the same misconduct would have resulted in the termination of a non-disabled employee; and (3) the termination was unrelated to the employee's compensable injury. Id.
3. An employer's successful demonstration of such evidence is "deemed to constitute a constructive refusal" by the employee to perform suitable work, a circumstance that would bar benefits for lost earnings, "unless the employee is then able to show that his or her inability to find or hold other employment . . . at a wage comparable to that earned prior to the injury is due to the work-related disability." McRae v. Toastmaster, Inc.,
___ N.C. ___, 597 S.E.2d 695 (2004). If the greater weight of the evidence shows that an employee's current unemployment status is the result of job-related injuries, the employer remains responsible for benefit obligations arising out of plaintiff's job-related injury. Under such circumstances, the fact that the employee was fired for unrelated misconduct is irrelevant because the employee's termination has no bearing on either the employee's existing compensable injury or how that injury affects his or her ability to find other employment. In the instant case, plaintiff's termination from employment constituted constructive refusal to accept suitable employment. Id. In Order to establish disability sufficient to rebut a finding of constructive refusal to accept suitable employment, the employee must prove disability by one of the four methods articulated inRussell v. Lowes Product Distribution, 108 N.C. App. 762,425 S.E.2d 454 (1993). Plaintiff failed to offer any evidence to support a finding of disability by any of the four methods.
4. Plaintiff is entitled to have defendant pay for medical expenses incurred or to be incurred as a result of the compensable injury as may be required to provide relief, effect a cure or lessen the period of disability. An employer acquires the right to direct medical treatment when it accepts an employee's claim as compensable. Kanipe v. Lane Upholstery,151 N.C. App. 478, 566 S.E.2d 167 (2002). Defendants provided medical treatment for plaintiff through Dr. Zeringue. Plaintiff embarked on her own course of care with various physicians she chose without the permission or consent of defendants or the Industrial Commission. While plaintiff had the right to pursue treatment of the conditions for which defendants had denied liability, with physicians she chose, plaintiff still had the burden of proving the treatment she received was for conditions causally related to her injury. As plaintiff failed to prove that the treatment provided by Drs. Dhawan, Beemer, Deochand, Edwards, Miles, and Mallon after her course of treatment with Dr. Zeringue was causally related to her compensable injury by accident of 8 September 2003, plaintiff is not entitled to medical compensation after terminating her treatment with Dr. Zeringue. N.C. Gen. Stat. §§ 97-2(19), 97-25, 97-25.1.
5. Plaintiff was not employed full-time by defendant-employer for 52 weeks prior to her injury by accident on 8 September 2003; therefore, her average weekly wage may not be computed by dividing her wage by 52 weeks, making methods one and two as set forth in N.C. Gen. Stat. § 97-2(5) inapplicable. A fair and just method to both parties to establish plaintiff's average weekly wage would be to divide the earnings during the period of plaintiff's employment by the number of weeks and parts thereof during which time plaintiff worked, the third method utilized in this statute. Accordingly, plaintiff's average weekly wage as computed by the Form 22 Wage Chart is $431.87, yielding a compensation rate of $287.93. N.C. Gen. Stat. § 97-2(5).
 * * * * * * * * * * *
Based upon the foregoing Findings of Fact and Conclusions of Law, the undersigned enters the following:
 AWARD
1. Plaintiff's claim for benefits must be and is hereby DENIED.
2. Defendants shall pay the costs.
This the 31st day of October 2005.
 S/_________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/_____________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_________________ BUCK LATTIMORE CHAIRMAN